IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Jazzmen Moore, *on behalf of* J.M., | CASE NO. 1:23-cv-0038 |
| Plaintiff, | DISTRICT JUDGE<br>James S. Gwin |
| vs. | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| Commissioner of Social Security<br>Administration, | **REPORT &<br>RECOMMENDATION** |
| Defendant. | |

Jazzmen Moore, on behalf of J.M., filed a complaint against the
Commissioner of Social Security seeking judicial review of the Commissioner's
decision denying supplemental security income. This Court has jurisdiction
under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a
Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report
and Recommendation. Following review, and for the reasons stated below, I
recommend the District Court affirm the Commissioner's decision.

**Procedural background**

In September 2020, Moore filed an application for supplemental security
income on behalf of her minor child, J.M., alleging a disability onset date of
January 1, 2016[1] and claiming that J.M. was disabled due to due to "autism,

---

[1]     "Once a finding of disability is made, the [agency] must determine the
onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x
422, 425 (6th Cir. 2006).

cognitive learning difficult[ies]." Tr. 56. By the next month, when Moore submitted a Disability Report, Moore had added attention deficit disorder (ADHD) to J.M.'s list of disabling illnesses, injuries, or conditions. *See* Tr. 151. The Commissioner denied Moore's applications at the initial level and upon reconsideration. Tr. 55–66, 67–76. In October 2021, an Administrative Law Judge (ALJ) held a hearing at which Moore testified. Tr. 32–53. In December 2021, the ALJ issued a written decision finding that J.M. was not disabled. Tr. 12–31. The ALJ's decision became final in November 2022, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Moore filed this action in January 2023. Doc. 1. In it, she asserts the following assignments of error:

> 1. [T]he regulations require ALJs to perform a "special technique" when evaluating the severity of mental impairments at Step Three and the ALJ did not perform that required analysis in this matter.
>
> 2. [T]he ALJ's Step Three determination that Plaintiff's autism spectrum disorder did not meet the requirements of Listing 112.10 is not supported by substantial evidence.

Doc. 13, at 1.

### Factual background

*1. Personal evidence*

J.M. was born in July 2013 and was two years and five months old on the alleged disability onset date. Tr. 56. Moore is J.M.'s mother. Tr. 39.

2

2. *Scholastic evidence*[2]

*First grade.* In December 2019, when J.M. was in first grade, her oral and written language scores showed that J.M. had average listening comprehension and near average oral expression and language skills. Tr. 261. She was given a diagnostic reading examination and she scored in the kindergarten range, decreasing significantly from the previous year. Tr. 264. J.M. was also deficient in the math portion of a readiness test and working on counting to 20 while first graders were expected to count to 100 by 1s, 5s, and 10s. Tr. 268.

In January 2020, J.M. struggled to demonstrate appropriate behavior if she experienced a change in routine or was told "no." Tr. 258. J.M. did not stay in her assigned area, wouldn't follow directions without repeated prompts, had tantrums, disrespected her peers and adults, and, at times, displayed physical aggression. *Id.* J.M. had trouble focusing during test-taking, refusing to speak or look at her test paper, walking away from the administrator of the test, or grabbing an item and beginning to play. Tr. 264. J.M. had deficits in forming sentences in response to questions, engaging in reciprocal verbal interactions, and maintaining topical focus. Tr. 270. At school, J.M. had up to three major tantrums per week and up to four minor meltdowns per day. Tr. 272. J.M.'s school and Moore decided to transfer J.M. to a school that offered a highly

---

[2]     This recitation of evidence is not intended to be exhaustive. It is limited to relevant facts submitted by the parties.

structured, single classroom environment. Tr. 279–80. J.M. received multiple accommodations at her new school including extended time on assignments, frequent breaks, and an adult assigned to sit with her during test-taking to cue and redirect J.M. as needed. *Id.* J.M.'s school psychologist noted that J.M. had a "good memory for things that [were] important to her." Tr. 441. Test scores showed that J.M.'s fluid reasoning—"the ability to solve novel problems independent of previous knowledge" and abilities in "quantitative reasoning, classification and spatial [skills], and knowledge of part to whole relationships"—was "significantly higher" than her verbal comprehension. Tr. 438. J.M.'s full scale IQ was in the low average range. *Id.* Her issue following directions was not one of comprehension but instead was one of compliance. Tr. 441.

*Second grade.* In the fall of 2020, when J.M. was in second grade, she was able to count to 100 with 96% accuracy. Tr. 453. Her scores on a diagnostic test for readiness were at a kindergarten level "overall." *Id.* J.M.'s scores for *Numbers and Operations* and *Algebra and Algebraic Thinking* placed her at a kindergarten level. *Id.* She was at a first-grade level in *Geometry* and *Measurement and Data. Id.* J.M.'s comprehension of literature was at a second-grade level. *Id.*

In January 2021, Moore met with J.M.'s teacher and educational team to review and adjust her individualized education plan (IEP). Tr. 364, 387. J.M. had been enrolled in special education since the age of six. Tr. 363–64. She had

4

"very limited attention to instructions and tasks" during online school. Tr. 363. J.M.'s conversational skills were mood dependent. Tr. 364–65. She struggled not to interrupt, to take turns, and to stay on topic. *Id*. J.M. "hastily responded 'I don't know' when she did not want to talk or [was] fixated on something else." *Id*. She made "very minimal progress" at school and struggled to "remember letter sounds and words that she had practiced frequently." *Id*. J.M. did not use "strategies to approach text" and her "lack of focus and frustration cause[d] … more difficulty in language arts." *Id*. She needed "a lot of adult support and positive reinforcement to complete any activities involving letters and words." Tr. 369.

In April 2021, special education teacher Christy Debalski reported that J.M. received "special education, occupational therapy, and speech-language therapy due to autism." Tr. 358–59. J.M had kindergarten-level functioning in reading, math, and writing. *Id*. An IEP amendment report noted that J.M. had "intense academic, communication, sensory and functional needs that require[d] a small classroom setting in order to provide the services she need[ed]," including "a modified curriculum, visual schedule, structured classroom setting, sensory activities, hands on task-based instruction and lessons/materials presented in multi modal fashion." Tr. 470. The report suggested that a single classroom environment would address J.M.'s social and communication needs as well as develop her independence and adaptive skills.

5

*Id*. J.M.'s "behavioral needs and interventions" were to be "provided as needed" in the classroom. *See id*.

### 3. *Medical evidence*

Since October 2017, J.M. had received psychiatric care and medication management at Signature Health, Inc. *See* Tr. 297. In February 2019, therapist Rachel Fabian conducted a child diagnostic assessment. Tr. 287–300. Fabian spoke to Moore, who reported that J.M. had begun kindergarten "with no problems" and without medication for the first half of the school year. Tr. 300, 305. Moore said that she hadn't been concerned about J.M.'s symptoms. Tr. 300. Over several months, however, J.M. became increasingly defiant and wasn't able to focus or stay on task. *Id*. J.M. didn't complete her assignments, became frustrated, and gave up. *Id*. Moore said that J.M. "c[ould] do well academically" if she could stay focused. *See id*. Fabian observed J.M. having trouble staying still during the evaluation and noted that J.M. was easily distracted. Tr. 295, 300. Fabian diagnosed J.M. with ADHD and oppositional defiance disorder (ODD). Tr. 305–06. She prescribed Metadate, a stimulant, and Clonidine, a sleep aid. Tr. 306.

In March 2019, J.M. saw Eileen McGee, M.D., for a psychiatric follow-up. Tr. 301–12. Moore reported that things were going well in the morning but by noon, J.M. was having behavioral issues and losing focus at school. Tr. 312. At night, Moore had trouble getting J.M. to sleep, though melatonin helped. *Id*. Dr. McGee increased Clonidine and replaced Metadate with Ritalin. *Id*.

6

In May 2019, J.M. saw Dr. McGee for a follow-up. Tr. 318. Moore reported that J.M. had difficulty with her handwriting but was making overall progress at school. *Id*.

In October 2019, J.M. had an appointment with Dr. McGee. *See* Tr. 323–24. Moore expressed concern that J.M., who was in first grade, might have autism spectrum disorder. Tr. 324. J.M. did not speak during the appointment. *Id*. She "answer[ed] some questions with nodding … [and] had this blank kind of stare." *Id*. Moore explained that "often [J.M.] w[ould] not speak with people that she d[id] not know" but that she spoke at home and at school. *Id*. Moore reported that J.M. preferred to play alone, acted like a two- to three-year-old at home, and "wasn't functioning where she should be." *Id*. Dr. McGee adjusted J.M.'s medications and recommended updated testing at school. *Id*.

In November 2019, J.M. had an appointment with Dr. McGee. Tr. 335. Moore reported that earlier that week, J.M. had been suspended from school for pulling a fire alarm. *Id*.

In January 2020, J.M. had an appointment with developmental pediatrician Catherine Scherer, D.O., at University Hospitals. Tr. 239–52. Dr. Scherer diagnosed J.M. with autism. Tr. 243.

In April 2020, J.M. had a follow-up Dr. McGee. Tr. 348. Moore reported that J.M. was attending school—first grade—from home due to the pandemic and that things had been very challenging. *See id*.

7

In December 2020 J.M. saw Dr. McGee. Tr. 354. Moore reported that J.M. was attending second grade fully online and that things had become even more difficult. *See* Tr. 354. Moore said that J.M. left home regularly without permission. *See id*. Moore reported one incident in which she found J.M. unexpectedly outside. *Id*. Moore learned that J.M. had climbed out of her bedroom window and dropped onto a grill that J.M. had directed her sister to position underneath the window to shorten the distance of her fall. *Id*. Moore requested an increase in stimulant medication. *Id*. Dr. McGee listed J.M.'s diagnoses as ADHD, autism, and intellectual disability. *Id*. Dr. McGee prescribed increased dosages of Vyvanse for improved focus and Guanfacine for reduced impulsivity. *Id*.

In September 2021, J.M. saw Dr. McGee for a follow-up. Tr. 488. Dr. McGee recorded that J.M.—a third grader—could not read well and displayed defiant behavior at home. *See id*. Dr. McGee continued Vyvanse and Guanfacine without adjustment. *Id*.

*4.  State agency and other opinion evidence*[3]

In January 2021, state agency consulting psychologist Cindy Matyi, Ph.D, M.D., reviewed the medical evidence. Tr. 56–60. Dr. Matyi found that J.M. had severe impairments including autism spectrum disorder, ADHD, and speech and language impairments. Tr. 58. Dr. Matyi found that J.M.'s autism did not satisfy Listing 112.10. *Id*. Dr. Matyi found that J.M. was "less than markedly limited" in all mental function domains, including social interaction and the acquisition and use of information. *Id*.

In April 2021, state agency consulting psychologist Courtney Zeune, Psy.D., reviewed the record upon reconsideration and adopted Dr. Matyi's findings including the "less than marked" limitations. Tr. 63–65.

In September 2021, J.M.'s teacher, Jessica Slouffman, completed a School Activities Questionnaire. *See* Tr. 234–35. Slouffman indicated that she had known J.M. for over two school years and had been J.M.'s head teacher for two months. Tr. 234. Slouffman said that although J.M. was in the third grade, she functioned at level between kindergarten and first grade. *Id*. Slouffman described J.M.'s enrollment in a "self-contained" classroom for students on the

---

[3]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g*., 20 C.F.R. § 404.1615.

autism spectrum. *See* Tr. 234. Slouffman opined that J.M.'s attention span and concentration, ability to work independently, and ability to understand and complete assignments on time were "less than average." *Id*. She opined that J.M. had an average ability to respond to changes in routine. *Id*. Slouffman said that J.M. showed "very slow progress!" in the ability to progress at learning the skills involved in reading, writing, and mathematics and "very low!!" functioning in this area. *Id*. Slouffman expressed concern over J.M.'s disruptive and distracted behavior, work avoidance, "talk[ing] back."  *Id*. The questionnaire asked about medical impairments that limited J.M.'s ability to function at school. *Id*. Slouffman responded by listing J.M.'s (1) speech, to which Slouffman attributed J.M.'s listening comprehension, oral expression, and social language issues; (2) eyesight, in that J.M. wore glasses; and (3) fine motor skills, to which Slouffman attributed J.M.'s "way below grade level" writing skills. *Id*. Slouffman noted that J.M. had excellent gross motor skills. Tr. 235. She noted that J.M. could "seem very 'with it'" and "tr[y] to hide her academic deficits," which could develop into avoidant behavior. *See* Tr. 235.

    *5.  Function Report*

    In October 2020, Moore completed a Child Function Report. Tr. 163–73. Moore checked boxes indicating that J.M. had problems talking clearly and could only be understood "some of the time." Tr. 167. Moore indicated that J.M. wasn't able to deliver phone messages, repeat stories that she heard, tell jokes or riddles accurately, or explain why she did things. Tr. 168. Moore said that

10

J.M. talked with family, talked with friends, and used sentences with "because," "what if," and "should have been." *Id*. Moore checked boxes indicating that J.M. could read simple words but could not read capital or small letters. *Id*. J.M. wasn't able to read and understand simple sentences, read and understand stories in books or magazines, write a simple story with six to seven sentences, or spell most three to four letter words. *Id*. J.M. could not print some of her letters or her name and could not write in cursive script. *Id*. Moore indicated that J.M. wasn't able to add and subtract numbers over 10 or tell time. Tr. 169. J.M. could not recite the days of the week or the months of the year. *Id*. J.M. did not understand money and couldn't count change. *Id*. Due to J.M.'s impairments, Moore reported, J.M. had no friends her own age, wasn't able to make new friends, did not generally get along with Moore or other adults, did not generally get along with her teachers, and did not play team sports. Tr. 171. Moore reported a limited ability to pay attention that prevented J.M. from keeping busy on her own, finishing things that she started, working on arts and crafts projects, completing homework, or completing chores most of the time. Tr. 173.

   *6. Testimonial evidence*

   Moore testified during the hearing in October 2021. Tr. 32–53. She was represented by attorney Mark Dlugopolsky, who began the substantive portion of the hearing with an opening statement advocating that the ALJ find that J.M. was disabled. Tr. 32, 37–39. Moore then testified. Tr. 39–53.

11

Moore testified that she lived in an apartment with her three daughters, including J.M., who was the middle child. Tr. 39. Moore said that J.M. did not get along with her older or younger sister. *Id*. J.M.'s sisters had trouble understanding J.M.'s issues. *See* Tr. 39–40. Moore said that J.M. preferred to play alone and didn't have any friends. Tr. 48. She described J.M. as "very much" a loner. Tr. 40. When J.M. played with her sisters, after five or ten minutes, they were arguing. *Id*.

J.M. had poor eye contact and rarely even made eye contact with Moore. Tr. 40. She cried when she did not get her way. *Id*. Moore said that J.M. was "very, very, very argumentative" and that it was as if J.M could not process things as would other children her age. Tr. 41. For example, if Moore tried to explain something serious, J.M. "usually [had] a smirk on her face, or just roll[ed] her eyes." Tr. 40–41. Moore said that if she took away J.M.'s iPad, J.M. just wouldn't process that she wasn't going to get her iPad back. *Id*.

J.M. took Vyvanse and Guanfacine once daily in the morning. Tr. 44. Moore said that the medications reduced J.M.'s appetite and made her drool and slobber. *Id*. J.M. participated in chores around the house—sweeping, vacuuming with assistance, emptying trash cans, and taking the trash out with supervision—though Moore had to remind J.M. multiple times. Tr. 46.

J.M. was the only girl in her class of five students, each member of which was on the autistic spectrum. Tr. 42. She hadn't had consistent teachers and it took a while for J.M. to warm up to a new instructor—J.M. did not handle

change well—though she was able to change schools and join the specialized autism unit. Tr. 43. J.M. was doing much better and talking more since the change. *Id*. Moore said that J.M. had been so quiet in her previous school that most of her teachers weren't even aware that she was able to talk. Tr. 43–44.

J.M. did not follow directions well. Tr. 40. J.M.'s teacher stopped assigning homework because "when [J.M.] gets home, [she's] going to do what she wants to do … and she's not going to do [homework]." Tr. 45. J.M. had attended the same daycare for two years and Moore hadn't received any bad reports from the daycare about J.M. Tr. 50. Even though J.M. received specialized instruction in the separate classroom, her academics were not improving. Tr. 50–51. Moore said that J.M. was "still just delayed; everything [was] delayed." Tr. 51. Moore mentioned that J.M. had recently broken her eyeglasses so she wouldn't have to wear them. *Id*. She said that J.M. got in trouble fairly regularly in school. *Id*. Moore explained that most of the reports of bad behavior Moore received stemmed from J.M. getting agitated or not following directions. *Id*. Moore estimated that she received approximately twice or three incident reports per month. *Id*.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law

> 1. The claimant was born [in July 2013]. Therefore, she was a school-age child on September 25, 2020, the date [the] application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

13

2. The claimant has not engaged in substantial gainful activity since September 25, 2020, the application date (20 CFR 416.924(b) and 416.971 et seq.).

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), Autism Spectrum Disorder (ASD), and intellectual disability (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a)....
The undersigned finds that the claimant has:

- less than a marked limitation in acquiring and using information;
- less than a marked limitation in attending and completing tasks;
- less than a marked limitation in interacting and relating with others;
- no limitation in moving about and manipulating objects;
- less than a marked limitation in the ability to care for herself; and
- no limitation in health and physical well-being.

6. The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since September 25, 2020, the date the application was filed (20 CFR 416.924(a)).

Tr. 15–27.

14

**Standard for disability**

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc.*

15

*Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the

16

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**Discussion**

As J.M. is a minor child, this is a childhood disability case. An ALJ considering disability in a child between the ages of three and eighteen will conduct a three-step sequential evaluation described in 20 C.F.R. § 416.924(a). "At step one, a child must not be engaged in "'substantial gainful activity.'" *Smoot v. Comm'r of Soc. Sec.*, No. 5:22-cv-01235-JDG, 2023 WL 1413097, at *12 (N.D. Ohio Jan. 31, 2023) (citing 20 C.F.R. § 416.924(b)). At step two, the ALJ will determine whether the child "suffers from any 'severe impairment.'" *See id.*, (citing 20 C.F.R. § 416.924(c)). At step three, the ALJ will determine whether a child's impairment, or the combination of his or her impairments, is "functionally equal" to an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Social Security "Listings"). *See id.* An ALJ determines whether a child's impairment functionally equals a listing by considering six domains of functioning: (1) "[a]cquiring and using information"; (2) "[a]ttending and completing tasks"; (3) "[i]nteracting and relating with others"; (4) "[m]oving about and manipulating objects"; (5) "[c]aring for yourself"; and (6) "[h]ealth

17

and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i)–(vi); *see Smoot*, 2023 WL 1413097, at \*12; *see also M.G. v. Comm'r of Soc. Sec.*, 861 F. Supp. 2d 846, 847–48 (E.D. Mich. 2012) (citing 20 C.F.R. § 416.924(a)). If a child's condition is not included in the Listing of Impairments, the ALJ will "compare the claimant's findings and 'all evidence in [the] case record' with 'closely analogous listed impairments.'" *Foltz obo R.B.K.F. v. Comm'r of Soc. Sec.*, No. 23-3362, 2023 WL 7391701, at \*3 (6th Cir. Nov. 8, 2023); *see* 20 C.F.R. § 416.926(b)–(e).

In general, the claimant bears the burden of establishing that a condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727–28 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)); *see also Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Id.* at 728 (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the medical equivalent of a listing[.]" *Id.* (emphasis in original). There is no heightened articulation

standard at step three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Here, at step two, the ALJ found that J.M. had severe impairments including ADHD, ODD, autism spectrum disorder, and intellectual disability. *See* Tr. 16 (citing 20 C.F.R. § 416.924(c)). The ALJ found that J.M.'s ability to function was "more than minimal[ly]" limited by these impairments. Tr. 16. At step three, however, the ALJ found that J.M. did not have an "impairment or combination of impairments that [met] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 17 (citing 20 C.F.R. §§ 416.924, 416.925 and 416.926).

Moore objects to the ALJ's finding at step three. Doc. 14, at 1. As the Commissioner notes, Moore makes two arguments based on one assertion. *See* Doc. 14 at 15, 20–22; Doc. 11, at 3 (citing Doc. 8 at 6, 12–13).[4] Moore asserts that the ALJ "never made specific findings as to the degree of limitation in each of the four broad [mental] functional areas." Doc. 14, at 15 (citing Tr. 17–18; 20 C.F.R. § 416.920a(e)(4)). Moore says that the decision to present findings without specifying a degree of limitation demonstrated that the ALJ failed to apply the "special technique" required for analysis of mental impairments. *See*

---

[4]     The Commissioner's Brief references Moore's arguments as found in Doc. 8, Moore's original Brief. *See, e.g,* Doc. 11, at 3, 4, 6. After she filed her brief, Moore acknowledged that she had not complied with the Court's initial order. *See* Doc. 13, at 1. Moore sought leave to file an amended, compliant Brief. Doc. 13; *see* Doc. 13-1. Because the Court granted Moore's request, Moore's amended brief was filed in September 2023. *See* Doc. 14. This decision thus cites Moore's amended brief. *See id.*

Doc. 14, at 15 (citing 20 C.F.R. § 416.920a(e)(4)). Moore seems to argue that if the ALJ had applied the special technique to her analysis, she would have described her findings more specifically, which would have led to a finding of disability. *See* Doc. 14, at 15–19. Moore says that the evidence in support of her first argument establishes the existence of a substantial question as to whether J.M. could have met or medically equaled Listing 112.10. *See* Doc. 14 at 19, 22 ("As described at pages 15–19, *supra*, the objective evidence of record demonstrates at least marked limitations in two broad functional areas—*i.e.*, understand, remember, or apply information and interact with others—such that Part B of Listing 112.10 was satisfied."). Moore claims that this entitles her to remand.

      1.  *Whether the regulations required the ALJ to evaluate the severity of J.M.'s mental impairments using a special technique.*

Moore claims that the ALJ "did not apply the correct legal standards" at Step Three. Doc. 14, at 13. She argues that that the ALJ was required to apply the special analysis technique found within 20 C.F.R. § 416.920a "for evaluating the severity of a mental impairment at Steps Two and Three of the sequential evaluation process." *Id*. As is discussed, Moore is mistaken.

The Social Security Administration divides the Listing of Impairments into two parts: Part A for Adult Listings, organized into fourteen categories from Listing 1.00 through Listing 14.00, *see* 20 C.F.R. § Pt. 404, Subpt. P, App.

1, §§ 1.00–14.00,[5] and Part B for Childhood Listings, similarly organized and spanning from Listing 100.00 to Listing 114.00, *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 100.00–114.00.[6] Childhood mental disorders are listed under Section 112 of the Social Security Listings. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.00.[7] So, here, J.M., who was eight years old, alleges disability under Part B of the Listings.

By its terms, the special technique found at section 416.920a is used to "evaluate the severity of mental impairments *for adults* (persons age 18 and over) and in persons under age 18 *when Part A of the Listing of Impairments is used*." 20 C.F.R. § 416.920a(a). As the Commissioner notes, and as the Listings reflect, Part A of the Listings applies to adults and Part B of the Listing applies to children. *See* 20 C.F.R. § 416.925(b). Only "[i]f the criteria in part B do not apply," will an ALJ "use the criteria in part A." 20 C.F.R. § 416.925(b)(2)(i). But this possibility would only arise if "those criteria give appropriate consideration to the effects of [an] impairment[] in children." *Id*.

---

[5]  *See Adult Listings (Part A)*, Listing of Impairments, https://www.ssa.gov/disability/professionals/bluebook/AdultListings.htm [https://perma.cc/NSB3-DTH2].

[6]  *See Childhood Listings (Part B)*, Listing of Impairments, https://www.ssa.gov/disability/professionals/bluebook/ChildhoodListings.htm [https://perma.cc/3Z6M-YWBJ].

[7]  *See 112.00 Mental Disorders - Childhood*, Listing of Impairments, https://www.ssa.gov/disability/professionals/bluebook/112.00-MentalDisorders-Childhood.htm#112_10 [https://perma.cc/E955-ZQQQ].

The ALJ here evaluated Listings under Part B. So the "'special technique'" found at 20 C.F.R. § 416.920a did not apply. The ALJ therefore did not err in not applying Section 416.920a. *See Gallo v. Colvin*, No. 15-cv-9302, 2016 WL 7744444, at *13 (S.D.N.Y. Dec. 23, 2016), *report and recommendation adopted*, 2017 WL 151635 (S.D.N.Y. Jan. 12, 2017), and *report and recommendation adopted*, 2017 WL 1215219 (S.D.N.Y. Mar. 31, 2017) ((finding no error where an ALJ did not apply the special technique found in 20 C.F.R. § 416.920 at step three because the regulation didn't apply to children) (citing *Miller v. Comm'r of Soc. Sec.*, 409 F. App'x. 384, 387 (2d Cir. 2010)).

As the Commissioner points out, this interpretation of 20 C.F.R. §416.920a is supported by the Program Operations Manual System (POMS) which instructs, "NOTE: Do not use the [special technique set forth in 20 C.F.R. § 416.920a(a)] to evaluate mental disorders in children under Part B of the Listing of Impairments." *See* Doc. 11, at 4 (citing DI 24583.005(A)).[8] Moore claims in her Reply Brief that POMS doesn't apply. *See* Doc. 12, at 2–3. The Commissioner, however, did not claim that it did. The POMS passage merely provides additional support for her interpretation of 20 C.F.R. § 416.920a(a).

---

[8]     The noted citation is apparently how the Social Security Administration refers to the POMS. *See* Doc. 11, at 4 n.3 (citing https://secure.ssa.gov/apps10/poms.nsf/lnx/0424583005 [https://perma.cc/PZ5T-AG2K].

Moore misreads the Commissioner's argument and, further, doesn't dispute what 20 C.F.R. § 416.920a(a) says.[9]

To the extent that Moore claims the ALJ erred in using the phrase "less than markedly limited" or any variation thereof, instead of including the specific degree to which she found that J.M. was limited, *see* Doc. 14, at 15 ("the ALJ never made specific findings as to the degree of limitation in each of the four broad [mental] functional areas") (citing Tr. 17–18; 20 C.F.R. § 416.920a(e)(4)), this argument is a non-starter.

First, Moore never explains how the ALJ's language finding that J.M. was "not markedly limited" in the four broad areas of mental functioning was erroneous or unsupported by substantial evidence, and provides no legal authority to support her claim. So Moore forfeited these issues. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997); *Sharpe v. Comm'r of Soc. Sec.*, No. 1:20 CV 2732, 2022 WL 2127960, at *4 (N.D. Ohio June 14, 2022) (citing *Bard v. Brown Cty.*, 970 F.3d 738, 750 (6th Cir. 2020)).

Second, even if Moore had made a proper argument, it would fail. The less-than-marked phrase is routinely used—without issue—by medical

---

[9]    An ALJ will use a separate "special technique called the 'whole child approach' to determine whether a child's medical condition 'functionally equals the listings.'" *Frazier on behalf of S.F. v. Comm'r of Soc. Sec. Admin.*, No. 9:20-cv-01901, 2021 WL 6841765, at *4 (D.S.C. Dec. 10, 2021), *report and recommendation adopted*, 2022 WL 247927 (D.S.C. Jan. 27, 2022) (quoting Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule-the "Whole Child" Approach, SSR 09-1p, 2009 WL 396031, at *1 (S.S.A. Feb. 17, 2009)). But Moore doesn't claim error as to this special technique.

professionals and ALJs alike to describe a child's limitations in a disability context. *See, e.g.*, *Crutchfield v. Comm'r of Soc. Sec.*, No. 1:20-cv-00572, 2021 WL 4477781, at *2 (N.D. Ohio Sept. 30, 2021); *Darks v. Comm'r of Soc. Sec.*, No. 1:14-cv-921, 2016 WL 703581, at *1, 4–5 (S.D. Ohio Jan. 25, 2016), *report and recommendation adopted*, 2016 WL 695992 (S.D. Ohio Feb. 22, 2016); *Figgs on behalf of J.J.B. v. Comm'r of Soc. Sec.*, No. 1:17-cv-481, 2018 WL 3751271, at *6–7 (S.D. Ohio Aug. 8, 2018), *report and recommendation adopted,* 2018 WL 4223139 (S.D. Ohio Sept. 5, 2018); *Gater on behalf of J.G. v. Comm'r of Soc. Sec.*, No. 17-12375, 2018 WL 4517619, at *2, 4–6 (E.D. Mich. Aug. 13, 2018), *report and recommendation adopted*, 2018 WL 4509658 (E.D. Mich. Sept. 20, 2018); *Scott o/b/o J.C.D. v. Comm'r of Soc. Sec. Admin.*, No. 4:18-cv-10803, 2019 WL 1141076, at *1 (E.D. Mich. Feb. 21, 2019), *report and recommendation adopted*, 2019 WL 1125738 (E.D. Mich. Mar. 12, 2019). Moore provides nothing to support her argument that the ALJ's language—finding J.M. "not markedly limited" rather than an affirmative description—was not sufficient.

2. *Whether substantial evidence supports the ALJ's finding at step three that J.M.'s impairments did not satisfy Listing 112.10.*

In her decision, the ALJ found that J.M. did not meet or medically equal Listing 112.10. Tr. 17. Moore says that the evidence, specifically the evidence that she cited in support of her first issue, raises a "substantial question" as to whether J.M. could have met or medically equaled Listing 112.10 for autism spectrum disorder. Doc. 14, at 19. As further explained below, the ALJ

supported her findings at step three with substantial evidence found elsewhere in her decision. *See* Tr. 19–26; *cf. Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (holding that so long as an ALJ makes "sufficient factual findings elsewhere in his decision to support his conclusion at step three" there is "no need to require the ALJ to "spell out every fact a second time."") (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).

An ALJ need not "articulate, at length, the analysis" at step three. *Bledsoe*, 165 F. App'x at 411. The Sixth Circuit has said that an ALJ need not "spell[] out every consideration that went into the step three determination." *Bledsoe*, 165 F. App'x at 411; *see also Snoke v. Astrue,* No. 2:10-cv-1178, 2012 WL 568986, at *6 (S.D. Ohio Feb. 22, 2012), *report and recommendation adopted*, 2012 WL 1058982 (S.D. Ohio Mar. 28, 2012); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 455 (6th Cir. 2016). An ALJ need not "articulate, at length, the analysis of the medical equivalency issue." *Bledsoe*, 165 F. App'x at 411. She should instead "review all evidence of impairments to see if the sum of [those] impairments is medically equivalent to a 'listed impairment.'" *Id.* (citing 20 C.F.R. § 404.1526). As more fully explained below, that is what the ALJ did here. She "review[ed] all evidence" of J.M.'s impairments and determined that their "sum" did not medically equal a "listed impairment." *See id.*; Tr. 19–26.

As Moore points out and the Commissioner acknowledges, it's true that the ALJ's explanation of Listing 112.10 is "sparse." *See* Doc. 11, at 6 (citing

Doc. 8, at 11). The ALJ set forth her findings using language lifted directly from the listing. *See* Tr. 17–18. Elsewhere in her decision, however, the ALJ made sufficient factual findings to support her conclusions under Listing 112.10. *See* Tr. 17, 19–26; *cf. Snoke v. Astrue,* No. 2:10-cv-1178, 2012 WL 568986, at *6 (S.D. Ohio Feb. 22, 2012), *report and recommendation adopted*, 2012 WL 1058982 (S.D. Ohio Mar. 28, 2012) ("a court must read the ALJ's step-three analysis in the context of the entire administrative decision, and may use other portions of a decision to justify the ALJ's step-three analysis.") (internal citations omitted).

The regulations define a marked limitation within the Childhood Listings as when an impairment or combination of impairments:

> interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. [One's] day-to-day functioning may be seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i). The evaluation of the areas of mental functioning in a child claimant between the ages of three to eighteen is specifically addressed in 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.10E1–4.[10]

---

[10]    *See What are the Paragraph B Criteria for Children Age 3 to the Attainment of Age 18?*, Listing 112.00-Mental Disorders Childhood, Social

"Understanding, remembering, or applying information" refers to a child's ability to "learn, recall, and use information to perform age-appropriate activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.00E1. Examples that "illustrate the nature of this area of mental functioning" include:

> understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing an activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make decisions.

*Id.* "Interacting with others" refers to a child's ability to "relate to others age-appropriately at home, at school, and in the community." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.00E2. Examples that "illustrate the nature of this area of mental functioning" include:

> engaging in interactive play; cooperating with others; asking for help when needed; initiating and maintaining friendships; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

---

Security                                                    Administration, https://www.ssa.gov/disability/professionals/bluebook/112.00-Mental Disorders-Childhood.htm#:~:text=The%20listings%20for%20mental% 20disorders%20for%20children%20are%20arranged%20in,compulsive%20dis orders%20(112.06)%3B%20somatic [https://perma.cc/LM5V-SR97].

*Id.* "How [a child] manifest[s] [a specific] area of mental functioning and [her] limitations in using [that area] depends, in part, on [the child's] age." *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 112.00E1; E2.

Moore says that the objective evidence shows a marked limitation in understanding, remembering, or applying information that "seriously interfered with [J.M.'s] ability to initiate, sustain, and complete activities within this domain." Doc. 14, at 16. Moore recites evidence, without analysis, regarding J.M.'s delayed reading, math, and writing skills. *Id.* Moore notes J.M.'s enrollment in special education, participation in therapy due to autism, and minimal progress despite transferring to a magnet school and being placed in an autism-only class. *Id.* (citing Tr. 358–59). Moore cites J.M.'s struggles with letters, words, and language arts. *Id.* (citing Tr. 369). Moore recites J.M.'s slow progress learning the skills involved in reading, writing, and math, her lower functional grade level as opposed to her actual grade level, and her behavior during diagnostic evaluations where she scored in the 20th percentile. *Id.* (citing Tr. 234–35, 264). Moore discusses the evidence of the extensive academic, communication, sensory, and functional accommodations J.M. required. Doc. 14, at 19 (citing Tr. 470). Moore cites 20 C.F.R. Part 404, Subpart P, Appendix 1, § 112.00F(3)(d) and argues that J.M.'s structural needs should have resulted in a greater limitation finding. *Id.* Moore also says that "[i]t appear[ed]" as if the ALJ failed to consider the support and structure J.M. received when she considered Listing 112.10. Doc. 14, at 19 N.4. Moore then—

having yet to provide analysis of the evidence or legal authority for her claim—
reiterates her conclusion that the objective evidence showed that J.M. had
serious limitations in her ability to understand, remember, or apply
information." Doc. 14, at 17.

Regarding the effects of support, supervision, and structure on
functioning,[11] Moore focuses solely on the paragraph containing the ALJ's
findings under Listing 112.10 and argues, essentially, that any analysis that
isn't articulated there isn't articulated at all. *See* Doc. 14, at 19. It's true that
the ALJ set forth her findings under Listing 112.10 without addressing, *in the
same paragraph*, her rationale in arriving at those findings, it isn't true that
this paragraph represents the ALJ's full consideration of the listing. *See* Tr.
17, 19–26. With respect to support, the ALJ referenced J.M.'s need for
supervision, special accommodations, special education classes, and the

---

[11]    Listing 112.00F(3)(d) states:

> The degree of limitation of an area of mental
> functioning also reflects the kind and extent of
> supports or supervision you receive (beyond what
> other children your age without impairments
> typically receive) and the characteristics of any
> structured setting where you spend your time, which
> enable you to function.  The more extensive the
> support you need from others (beyond what is age-
> appropriate) or the more structured the setting you
> need in order to function, the more limited we will
> find you to be.

*See* the Listing of Impairments, Section 112.00 at
https://www.ssa.gov/disability/professionals/bluebook/112.00-Mental
Disorders -Childhood.htm#112_00F.

support and supervision that J.M. received. *See, e.g.*, Tr. 23 (considering J.M.'s "p[lacement in  a special education program"), Tr. 24 (noting recommendations that J.M. receive small group and individualized intensive instruction in all academic areas, receive information through a "highly structured approach[,]" and highlighting her eligibility for special education and related services due to autism), Tr. 25 (considering J.M.'s "determined attitude and need[] [for] strong guidance from adults at times to make sure she [made] good choices or practice[ed] skills correctly" as well as her success with a "very strict routine that did not deviate so that she could anticipate what [would] happen.").

More importantly, the ALJ directly addressed Listing 112.10 in her decision and found that, under the broad areas of mental functioning listed in paragraph B, J.M. had limitations in understanding, remembering, and applying information that were "less than marked." Tr. 17. The ALJ provided sufficient factual findings elsewhere in her decision to support this finding. *See, e.g.*, Tr. 29, 23. For example, the ALJ cited Moore's October 2020 Function Report.[12] Tr. 23 (citing Tr. 163–74). Moore indicated that J.M. could "read simple words" but wasn't able to read capital or small letters of the alphabet[,] … read and understand simple sentences or stories in books or magazines, print some letters or her name, write in longhand, spell most [three to four] letter words, write a simple story with [six to seven] sentences, or add or

---

[12]    In October 2020 when that Moore completed this Function Report, J.M. was seven years old. *See* Tr. 165.

subtract numbers over ten." Tr. 23 (citing Tr. 169). According to Moore, J.M. did not know the days of the week or the months of the year, did not understand money, and could not tell time. *Id.* The ALJ considered J.M.'s "p[lacement in a special education program." Tr. 23 (citing Tr. 224–29). One year later, however, J.M. was able to count to 100 with 96% accuracy and her comprehension of literature was at a grade level. Tr. 441. The ALJ cited J.M.'s standardized test results including her average to just below average oral and written language scores from January 2020. Tr. 24 (citing Tr. 253–84). J.M.'s performance on standardized and readiness tests supports the ALJ's "less than marked" limitation finding. *See*, *e.g.,* Tr. 24 (citing Tr. 266). J.M. occasionally tested at an average or expected grade level. *See, e.g.,* Tr. 261, 453. Sometimes, she demonstrated a two-year delay. *See, e.g.,* Tr. 234–35, 358–59, 453. More often, however, J.M. was one year behind. *See, e.g.,* Tr. 264, 266, 268. Moore doesn't claim that this represents a limitation that is "at least two, but less than three, standard deviations below the mean" and has provided no evidence to show that it does represent such a deviation. *See* 20 C.F.R. § 416.926a(e)(2)(i).

The ALJ acknowledged J.M.'s limitations by citing recommendations for small-group and individualized intensive instruction in all academic areas. Tr. 24. She cited J.M.'s requirement that her teachers take a "highly structured approach" when providing J.M. information. Tr. 24. The ALJ noted J.M.'s eligibility for special education and related services due to her diagnosis of

autism. Tr. 24. She noted J.M.'s tendency to both mumble and speak rapidly, which impeded her ability to clearly articulate multisyllabic words. Tr. 24 (citing Tr. 253–84). The ALJ wrote that the plan indicated, however, that J.M.'s speech was "intelligible, … most of the time." Tr. 24. The ALJ cited J.M.'s IEP from April 2021, when J.M. was in second grade. Tr. 24, 452. The ALJ considered that J.M. was scoring at a kindergarten level in phonological awareness, phonics, high frequency words, vocabulary, and the comprehension of information via text. Tr. 24 (citing Tr. 448–84). J.M. was, however, able to comprehend literature at a second-grade level. Tr. 24. The ALJ considered Slouffman's questionnaire, noting that at the time she filled it out, Slouffman had known J.M. for more than two school years and had been J.M.'s head teacher for two months. Tr. 24 (citing Tr. 232–35). J.M. was in third grade but had a kindergarten to first grade level of functioning. *Id*. She made "very slow progress" in her reading, writing, and mathematics skill development. *Id*. Her "fine motor skills" were "way below grade level in writing" though she had excellent gross motor skills. *Id*. The ALJ considered J.M.'s deficits in listening, comprehension, oral expression, and social language. *Id*. "Regarding the less than a marked limitation in attending and completing tasks," the ALJ wrote, J.M. completed chores around the house. *See* Tr. 24 (citing Tr. 163–74).

The ALJ referenced J.M.'s January 2020 IEP which "noted that [J.M.] demonstrated attention challenges." Tr. 24 (citing Tr. 356–447). The ALJ considered that J.M. was "distracted by noises, activity, and things she

observed within the environment … [and that she] often fixated on things, repeated things, and needed to complete her agenda before moving on." Tr. 24. The ALJ discussed how, sometimes, J.M. was "distracted by her own internal agenda, unknown to others," and "sought movement, … [by] sitting, standing, [and] fidgeting with items in close proximity to her[,] … and [that] her body was [often] in motion, wiggling in [her] chair, leaning forward on [the] table, etc." Tr. 24. The ALJ turned to J.M.'s conversational habits and noted that she "interrupt[ed] others[,] … demonstrated challenges with appropriate wait time and turn taking, [and] offered off topic comments unrelated to the situation." Tr. 24. The ALJ cited an insight from the IEP that J.M.'s issue with directions was one of "[c]ompliance … rather than comprehension." Tr. 24. She had, however, "made significant progress" answering simple questions of who, what, where, and why. *See* Tr. 454. The ALJ noted that J.M. "needed to attend and focus during adult directed activities" and that, due to "delays with verbal expression[,]" she needed direct instruction and communication. Tr. 24. The ALJ considered J.M.'s demonstrable struggle to pay attention and participate consistently in adult-directed activities. Tr. 24.

J.M's IEP from January 2021, cited by the ALJ, provides additional support for the finding that J.M.'s ability to understand, remember, or apply information was limited, though less than markedly so. Tr. 17. In that IEP, the ALJ noted, J.M.'s evaluation team reported that during virtual learning, J.M. "presented with very limited attention to instruction and tasks." Tr. 24 (citing

Tr. 356–447). The ALJ considered reports that J.M. was "off task, play[ing] with buttons on her iPad, dr[awing] on the screen, sp[inning] in her chair, log[ing] herself off randomly, and le[aving] the room." Tr. 24. She cited the report's findings that, in the classroom, "J.M. enjoyed [completing] puzzles, playing with Legos or other building type items, coloring and looking at books." Tr. 24–25. The ALJ considered J.M.'s description as a "creative" student who "enjoyed interacting with adults [and] … enjoyed math[,] and [enjoyed] working with numbers. Tr. 25. The ALJ noted the finding that J.M.'s smaller classroom setting with fewer students allowed her to "avoid the negative social behaviors she display[ed] [in] … larger classroom setting[s] at her previous school." Tr. 25. The ALJ considered J.M.'s "determined attitude and need[] [for] strong guidance from adults at times to make sure she [made] good choices or practice[ed] skills correctly." Tr. 25. The ALJ noted J.M.'s success with a "very strict routine that did not deviate so that she could anticipate what [would] happen." Tr. 25.

The ALJ noted that when J.M.'s teachers presented her with text orally, she "displayed a strength in comprehending the text and answering questions related to the story" and "enjoyed talking about the stories." Tr. 25. She considered J.M.'s capacity to "dict[ate] complete sentences in response to a prompt or question." Tr. 25. The ALJ noted how much J.M. "enjoyed math and readily participated in math sessions[,] often ma[king] up her own math problems on her white board during virtual learning to show her teacher." Tr.

25. The ALJ indicated that J.M. received speech and language therapy for 120 minutes monthly, and that her hearing was within normal limits. Tr. 25. J.M.'s occupational therapist reported that J.M. did best when she formed her letters using a visual model. *See* Tr. 454. J.M. was "able to follow directions and complete all tasks given to her during therapy sessions." *Id.* The therapist noted J.M.'s enjoyment of puzzles, coloring, and play dough. *Id.* J.M. was below average in the ability to pay attention and concentrate during class and in the ability to understand her assignments and complete them on time.  Tr. 25 (citing 232–25). J.M.'s abilities in responding to changes in routine and working independently were average. Tr. 25. J.M. "could be disruptive[,] … usually [displayed] work avoidance behavior[,] [s]ometimes … "talked back" to the teacher[,] [and] was easily distracted throughout the day. Tr. 25. "In a larger classroom" for general education, the ALJ noted that J.M. could be "disruptive[,] … refus[e] to work[,] and … [display] work avoidance behavior." Tr. 25.

So, while the evidence demonstrated limitations in J.M.'s ability to understand, remember, or apply information, on balance, there was sufficient evidence to support a not-markedly-limited finding in this domain in that J.M.'s limitations did not "seriously interfere[]" with her ability to initiate, sustain, and complete activities. *See* Tr. 17; *see also* 20 C.F.R. § 416.926a(e)(2)(i).

Also, despite her claims to the contrary, Moore hasn't shown a reasonable likelihood that J.M. could have established a "marked" limitation in the domain of understanding, remembering, and applying information. Moore does not cite specific evidence of serious interference with J.M.'s ability to initiate, sustain, or complete activities independently within this domain. *See* 20 C.F.R. § 416.926a(e)(2)(i). She does not highlight day-to-day functioning that was seriously limited by J.M.'s impairments. *See id*. Moore does not show how J.M.'s limitations in this domain are "more than moderate" but "less than extreme." *See id*.

What's more, the evidence to which Moore points is countered by other evidence in the record, such as J.M.'s "good memory for things that [were] important to her" and a report that her not following directions was an issue of compliance, not comprehension. Tr. 441. In first grade, J.M. had an overall kindergarten-level of functioning in reading, math, and writing. Tr. 358–59. In second grade, she was able to count to 100 with 96% accuracy and her comprehension of literature was at grade level. *Id*. J.M. had strong comprehension when she received text orally. *See* Tr. 25. She enjoyed talking about stories she heard and was able to answer questions related to them. *Id*. J.M. had a "full scale IQ in the low average range." Tr. 453. She "enjoyed math and readily participated in math lessons." *Id*. J.M. often "ma[de] up her own math problems on her white board during virtual learning to show her

teacher." *Id*. She was "capable of dictating complete sentences in response to a prompt or question." Tr. 266.

With respect to the ability to interact and relate with others, the ALJ found that J.M. had limitations that were "less than marked." Tr. 17. The ALJ supported this finding with evidence that showed that J.M. "did not have friends, did not generally get along with other adult or schoolteachers, and did not play team sports." *See* Tr. 19, 25. J.M. "did not do what she was told, she did not obey safety rules, and she did not accept criticism or correction." Tr. 25. She "did not finish things she started" or complete her work on "arts and crafts projects, homework, or her chores." *Id*. The ALJ considered J.M.'s "struggle[e] … [to] demonstrate[e] appropriate school behaviors[,]" such as "follow[ing] directions without repeated prompts, [refraining from] tantrums when things did not go her way," avoiding argumentative behavior, and remaining respectful to her peers and adults. Tr. 25 (citing Tr. 356–447). The ALJ noted that J.M. had been suspended for pulling the fire alarm without warrant and had, "at times," been physically aggressive. Tr. 25 (citing 238–252). "In a larger classroom … setting" the ALJ wrote, J.M. could be "disruptive, refuse to work and [display] work avoidance behavior." Tr. 26. She noted, however, that J.M. "got along with [her] peers." Tr. 26. J.M. could "seem very 'with it'" and "tr[ied] to hide her academic deficits." Tr. 26 (citing Tr. 235).

J.M. was "very loving with adults that she trusted, giving hugs, sharing something important to her or just stopping to say hello" during the previous

school year. Tr. 26 (citing Tr. 253–284). The ALJ considered more recent reports that when "more [was] … expected of [J.M.] as a first grader, she often felt that adults were trying to get her into trouble, … being mean (when [J.M.] [was] redirected or [the adults used] a firm voice … ), or … trying to trick her." Tr. 26. "When J.M. interacted with an adult that she did not know well," the ALJ wrote, "she would frequently stare and ignore them, with no verbal response." Tr. 26. The ALJ cited an IEP from April 2021 noting that J.M. "needed continued practice with behavior and social skill goals to ensure" she would succeed. Tr. 26 (citing Tr. 448–484). The ALJ considered the "intense academic, communication, sensory and functional needs" J.M. had that required her to be placed in "a small classroom setting" so she could receive all of the "services she needed." *Id*. Moore said that J.M. had problems speaking clearly, Tr. 25 (citing Tr. 164–174), however, people who knew J.M. well understood her and those who weren't familiar with J.M. understood her some of the time. Tr. 25. J.M. "had a tendency to mumble" and spoke rapidly which "affect[ed] the clarity of multisyllabic words." Tr. 24. The ALJ found, also, that J.M.'s speech was "intelligible … most of the time." *Id*. She considered J.M.'s ability to "talk[] with family and friends." *Id*. So the evidence supports a limitation in J.M.'s ability to interact with others that is not "marked" since there is no evidence of such a limitation "seriously interfer[ing]" with J.M.'s ability to initiate, sustain, or complete social activities.

Moore says that her evidence—which is, again, referenced without analysis—demonstrates a marked limitation that "seriously interfered with [J.M.'s] ability to initiate, sustain, and complete activities within this domain." Doc. 14, at 18. She notes that J.M. "present[ed] as mute" when she met Dr. McGee, however, Moore also indicates that J.M. spoke at school and at home. Doc. 14, at 18 (citing Tr. 324). Moore cites J.M.'s tantrums, disrespectful behavior, and physical aggression. *Id*. (citing Tr. 258). Moore notes J.M.'s global deficits in the use of language. *Id.* (citing Tr. 270). She recites the behavior—an average of two to three major tantrums per week and "at least" three to four "minor meltdowns" per day—that led J.M.'s educational team to recommend her transfer to a highly structured program at a magnet school. *See* Doc. 14, at 18–19 (citing  Tr. 272, 279–80). Moore cites J.M.'s "continued … difficulty interacting with others" during second grade, noting that J.M.'s conversational skills depended on her mood, that J.M. struggled not to interrupt others during conversations, and although J.M. enjoyed telling stories, she had a hard time taking turns and maintaining the topic. Doc. 14, at 19. J.M. could be disruptive and had deficits in listening comprehension, oral expression, and social language. *Id*. (citing Tr. 234–35). Moore concludes this evidentiary passage by claiming, without citing legal authority or applying her facts, that this evidence demonstrates "serious limitations in [J.M.'s] ability to interact with others." See Doc. 14, at 19.

But this evidence does not establish, with specificity, serious interference with J.M.'s ability to independently initiate, sustain, or complete activities in interacting with others. *See* 20 C.F.R. § 416.926a(e)(2)(i). Moore also fails to show that the ALJ's finding—that J.M. was *not* markedly limited in this domain—was *not* supported by substantial evidence. *See* Tr. 17. And the evidence that Moore reiterates is countered by other evidence in the record. For example, although Moore claims that J.M. had unintelligible speech, people who knew J.M. understood her. *See* Tr. 25 (citing Tr. 164–174). She talked with family and friends. *Id.* J.M. displayed "very loving" behavior to trusted adults, giving hugs and stopping by to say hello. Tr. 26 (citing Tr. 253–284). J.M. "got along with peers," made attempts to hide her academic deficits, and "c[ould] seem very 'with it.'" Tr. 26 (citing Tr. 235). Moore has not, as she must, referenced specific evidence to establish the existence of a substantial question as to whether J.M.'s limitations were marked in the disputed domains and thus she might have met or equaled the listing. *See Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 642 (6th Cir. 2013) ("A substantial question about whether a claimant meets a listing requires more than what Sheeks has put forth here, a mere toehold in the record on an essential element of the listing.").

So Moore fails to demonstrate a reasonable likelihood that J.M.'s impairments could have met or medically equaled each of the elements of Listing 112.10 and thus Moore does not establish the existence of a substantial question for which remand is warranted. *See Scott o/b/o J.C.D. v. Comm'r of*

*Soc. Sec. Admin.*, No. 4:18-cv-10803, 2019 WL 1141076, at *1 (E.D. Mich. Feb. 21, 2019) ("to be found disabled based on meeting a listed impairment, the claimant must exhibit all the elements of the listing"), *report and recommendation adopted*, 2019 WL 1125738 (E.D. Mich. Mar. 12, 2019); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.10; *see also Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Even assuming that the ALJ did not meaningfully address Listing 112.10 in her decision, Moore hasn't met her burden to show that there is a substantial question as to whether J.M. met or medically equaled Listing 112.10. *See* Doc. 14, at 16–19; 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.10.*; see also Foltz*, 2023 WL 7391701, at *4 ("Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding"); *King v. Sec'y of Health & Human Servs.,* 742 F.2d 968, 973–74 (6th Cir. 1984) (the claimant has the burden to establish evidence of all elements necessary to meet a listing). So even if the ALJ's analysis under Listing 112.10 fell short, the error was harmless because Moore hasn't put forth sufficient evidence to demonstrate that her impairments met or equaled the listing. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.10; *see also Doolittle v. Comm'r of Soc. Sec.*, No. 1:17-cv-1942, 2018 WL 4615965, at *10 (N.D. Ohio Sept. 26, 2018) ("an ALJ's conclusory findings at Step Three [are] harmless error where the claimant did not put forth sufficient evidence to demonstrate that her impairments met or medically

41

equaled the severity of the listing."), *aff'd* 2019 WL 6464019 (6th Cir. Sept. 4, 2019); *see also Smith-Johnson.,* 579 F. App'x at 432; *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x at 365; *Sheeks*, 544 F. App'x at 642; *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x at 416. To the extent that the ALJ's step three evaluation was conclusory even considering the support elsewhere in her decision, the court must "determine whether the record evidence raises a substantial question as to [the claimant's] ability to satisfy each requirement of the listing.'" *Doolittle*, 2018 WL 4615965, at *10 (quoting *Smith-Johnson,* 579 F. App'x. at 432–33). The claimant must establish that she could have reasonably met or equaled every requirement of the listing by pointing to specific evidence. *See Smith-Johnson,* 579 F. App'x. at 432. Without such evidence, an ALJ's failure to evaluate a listing at step three is not reversible error. *See id.* at 433; *see also Doolittle*, 2018 WL 4615965, at *10. To that end, Moore hasn't pointed to evidence in the record that would establish a more than marked limitation in any of the four areas of mental function. So Moore hasn't presented evidence that raises a substantial question. *See Doolittle*, 2018 WL 4615965, at *11; *see also M.G*, 861 F. Supp. 2d at 862–63 (finding that remand was warranted due to deficiencies in the ALJ's narrative, but, "[a]dmit[ing]" that when the record was considered as a whole, there was not "overwhelming evidence that the Plaintiff [had] "marked" limitations in … age-appropriate … concentration, persistence, or pace criterion."). Moore hasn't shown that there "remains an open question," let alone established the fact

that such a question is a *substantial* one that justifies remand. *See Sheeks*, 544
F. App'x at 642 ("Sheeks must do more that show that the ALJ's decision leaves
open the question whether he meets listing 12.05(C). He must show that the
open question is a *substantial* one that justifies remand.") (internal citations
omitted); *see also Thacker*, 93 F. App'x at 727–728 (a claimant must show that
she meets or equals a listed impairment through the presentation of "specific
medical findings satisfying the various tests" of the listing) (internal citations
omitted).

Lastly, Moore ignores the standard of review. Moore essentially claims
that because she believes substantial evidence in the record exists to support
a marked limitation in the two areas of mental functioning, the ALJ's finding
of a "less than marked limitation" is *not* supported by substantial evidence. *See*
Doc. 14, at 15, 19. But Moore fails to demonstrate that the ALJ's less-than-
marked determination lacked such support. *See* Tr. 16–19. The ALJ, on the
other hand, supported her step-three findings under Listing 112.10 with
sufficient factual findings elsewhere in her decision. *See* Tr. 17, 19–26; 20
C.F.R. § Pt. 404, Subpt. P, App. 1, 112.10; *see also Lewis on behalf of R.L.P. v.
Comm'r of Soc. Sec.*, No. CV 19-13627, 2021 WL 771761, at *4 (E.D. Mich. Feb.
8, 2021), *report and recommendation adopted*, No. 19-13627, 2021 WL 764129
(E.D. Mich. Feb. 26, 2021) (upholding an ALJ's finding that R.L.P.'s autism did
not satisfy Listing 112.10 where the ALJ's step three analysis was justified by
"extensive discussion of R.L.P.'s medical, psychological and educational

43

records as … related to his mental functioning" and the ALJ "fulfilled his obligation by specifically discussing the accommodations R.L.P. received."). Whether substantial evidence might be found to support a marked limitation in two areas of mental functioning is irrelevant because Moore doesn't show how the ALJ's findings were *not* supported by substantial evidence. Moore's argument is an invitation to reweigh the evidence that this Court must decline. *See Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020).

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: November 22, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)